1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    SHANA MARIE KELLY,                    Case No. 24-cv-08568-DMR

8              Plaintiff,

9         v.                              **ORDER GRANTING IN PART AND
                                          DENYING IN PART DEFENDANT'S
10   SAN FRANCISCO CITY AND COUNTY         MOTION TO DISMISS**
     DEPARTMENT OF PUBLIC HEALTH          Re: Dkt. No. 13
11   LAGUNA HONDA HOSPITAL,

12             Defendant.

13        Self-represented Plaintiff Shana Marie Kelly filed a complaint against the City and County

14   of San Francisco[1] ("Defendant" or "City"), asserting claims under Title VII of the Civil Rights Act

15   of 1964, 42 U.S.C. § 2000e *et seq.* [Docket No. 1 ("Compl.").][2]  The City moves to dismiss her

16   claims.  [Docket No. 13 ("Mot.").]  Kelly opposes the motion [Docket No. 17 ("Opp'n")], and the

17   City filed a reply [Docket No. 18 ("Reply")].  The court held a hearing on March 27, 2025.  [Docket

18

19   ---

     [1] Kelly named as a defendant "San Francisco City and County of DPH (Dept of Public Health)
20   Laguna Honda Hospital."  *See* Compl.  As the City asserts that "San Francisco City and County of
     DPH (Dept of Public Health) Laguna Honda Hospital" was erroneously named and that it is the
21   proper defendant (Mot. at 7), the court refers to the City in this order.

22   [2] The complaint attaches 17 exhibits and a Statement of Facts ("SOF").  [Compl. at ECF pp.15-101
     (exhibits); Docket Nos. 1-1 & 12 ("SOF")].  The complaint incorporates the SOF by reference.  [*See*
23   Compl. ¶ 10 ("(Statement of facts typed & attached) (#10-49)"); SOF (starting at paragraph 10).]
     The court may therefore consider the exhibits and SOF without converting the City's motion to
24   dismiss into a motion for summary judgment.  *See United States v. Ritchie*, 342 F.3d 903, 907–08
     (9th Cir. 2003) ("When ruling on a Rule 12 (b)(6) motion to dismiss, if a district court considers
25   evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion
     for summary judgment, and it must give the nonmoving party an opportunity to respond. . . . A court
26   may, however, consider . . . documents attached to the complaint [and] documents incorporated by
     reference in the complaint, . . . without converting the motion to dismiss into a motion for summary
27   judgment.").

28

United States District Court
Northern District of California

No. 22.]

For the following reasons, the motion to dismiss is granted in part and denied in part. Kelly is granted leave to file a first amended complaint ("FAC") by October 30, 2025 solely to address the deficiencies identified in this order.

## I.     BACKGROUND[3]

### A.     Factual Allegations

Kelly is a Black woman who has been employed by the City and County of San Francisco's Department of Health ("DPH") since December 2016 as a part-time 1429 Nurses Staffing Assistant ("NSA") at Laguna Honda Hospital ("LHH"). [Compl. ¶¶ 9-10; SOF ¶ 11.] Her job responsibilities include "coordinating daily staffing levels for all nursing units," backfilling sick calls and benefit time off to maintain staffing, activating emergency calls/codes, "preparing and maintaining various labor and productivity records and reports," and monitoring licensing and certification of nursing personnel. [Compl. ¶ 6.] Kelly has received satisfactory performance reviews with a score of "2." [*Id.* ¶ 9.] Recently, however, management has displayed "more bias in reporting"—specifically, "feedback [that has been] more biased"—but that has not affected her performance scores. [*Id.*] Kelly was also employee of the month three times. [*Id.* at 5.]

Kelly alleges she has been subjected to discrimination, retaliation, and a hostile work environment because of her race. As a result of this misconduct, Kelly is "still with a part-time status even with close to 8 years seniority" and despite "working a full-time schedule." [SOF ¶ 11.] In addition, "others have been promoted to full-time [status] regardless of the order of departmental seniority and prioritization of existing internal 1429 [NSAs]." [*Id.*]

#### 1.     The March 18, 2019 Knife Incident

On March 18, 2019, co-worker Joan Saez Fontilla, who is Asian, "yelled at [Kelly] about

---

[3] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted). Additionally, in determining whether a pleading satisfies Rule 8, a court may consider "materials that are submitted with and attached to the Complaint." *See United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)).

United States District Court
Northern District of California

staffing with a knife in [her] hand in [Kelly's] cubicle[.]"  [SOF ¶ 12.]  This took place in front of "[t]he Supervisor (Director) Rowena Patel," who is Asian, while Patel was on duty.  [*Id.*]

After Kelly asked Saez Fontilla to put down the knife and told Patel that she did not feel safe or comfortable in light of Saez Fontilla's behavior, Kelly called the sheriff.  [*Id.*]  Kelly "completed a Sheriff statement," and two individuals from the Sheriff's office, Tong and Yee, completed a report.  [*Id.*]  Neither management nor human resources took any action, and the knife remained in the office.  [*Id.*]

### 2.  Kelly's Complaints

In April 2019, Kelly met with union representative Dennis Mars, human resources, and management regarding the knife incident and hostile work environment.  [*Id.* ¶ 13.]  Human resources "stated [that] they do not ban employees from having kitchen utensils."  [*Id.*]

Kelly made an HR complaint.  [*Id.* ¶ 14.]  It is unclear whether the complaint concerned the knife incident and/or other incidents of harassment.  Kelly does allege, however, "[o]ne of the aggressors" named in the complaint, Shane Peralta[4] (who is Asian), filed a complaint after Kelly's in retaliation.  [*Id.*]  "HR and Management (Ed Guina and Irin Blanco)," who are both Asian, allowed Peralta's complaint to take precedence over Kelly's and launched an investigation, even though Kelly filed her complaint first.  [*Id.*]  Guina and Blanco proposed a five-day unpaid suspension of Kelly.  [*Id.*]

Mars and Kelly raised Peralta's complaint, the knife incident, and Kelly's suspension to "the assigned Hearing Officer, Don Jeffries, Sr HR Labor Relations representing [the] SF City and county HR."  [*Id.* ¶ 15.]  Jeffries "determined that there was nothing actionable . . . to warrant a charge/penalty of this level," and on August 15, 2019, the five-day suspension was dismissed with an apology.  [*Id.*; Ex. E at ECF p.34 (8/23/19 email from Jeffries "recommend[ing] withdrawal of the proposed discipline").][5]

---

[4] Kelly does not explain what incident Peralta was involved in.

[5] Unless otherwise indicated, citations to exhibits refer to those attached to the complaint.

### 3.     Kelly's Leave of Absence and Return to Work

On March 23, 2019, Kelly went on stress leave due to ongoing harassment, workplace violence, and the knife incident. [SOF ¶ 12.]  When Kelly returned to work on November 8, 2019, she worked several shifts with Saez Fontilla. [*Id.* ¶¶ 15, 16.]  Kelly was also "shuffled to work whatever was left" and was "forced to work [a] double-shift on [the] weekend to make up for hours missed," or else she would lose hours and pay. [*Id.* ¶ 16]  This was resolved after countless meetings with Guina. [*Id.*]

Kelly's regular scheduled was restored (*id.* ¶ 17), though Kelly does not allege when this happened.

### 4.     Interactions with Vilanova

Diana Vilanova, who is Latina, was hired at the end of July 2022 as a 1429 NSA. [*Id.* ¶ 18.] Around November 29, 2022, Vilanova called Kelly "Choco," a derogatory Spanish slur meaning "stupid, lazy, blind, dumb." [*Id.* ¶ 20; Ex. F at ECF pp.37-38.]

On November 30, 2022, Kelly met with her supervisor, Nursing Director for Nursing Operations Maria Antoc (who is Asian), and supervising nurse manager Brigitta Van Ewijk (who is South American) to discuss the incident, as well as Vilanova's "recent use of the [N word] in conversation around [Kelly] in the office." [SOF ¶ 21; Ex. F at ECF p.37.]

In response to Kelly's December 1, 2022 follow up email, Antoc expressed her "hope that everyone in the nursing office get along professionally." [Ex. F at ECF p.39.]  Antoc further stated that "[i]t is already challenging in our work place due to our recertification" and "we do not want [a] rift between staff." [*Id.*]  Antoc thus concluded, "[l]et us try to resolve issues as best we can so we can work harmoniously in the nursing office." [*Id.*]  Over a year and a half later, in a September 12, 2024 email, Kelly asserted that Van Ewijk "did not report [Vilanova's use of the N word] to HR" and told Kelly she was "being too sensitive." [Ex. M at ECF p.66.]

On January 26, 2023, Kelly had a meeting with Antoc and Vilanova, during which they discussed Vilanova's use of a Spanish slur on November 29, 2022 and use of the N word prior to that date. [SOF ¶ 23; Ex. F at ECF pp.40-41.]  Also on January 26, 2023, Kelly "informed EEO [about] this meeting[.]" [SOF ¶ 23.]

Another supervisor, Melanie Ferrer, who is Asian, became aware of the incident "[w]ithin a day or so" because Kelly "discussed it with her at or around the time the incident(s) took place initially[.]"  [SOF ¶ 23.]  Ferrer "asked if the meeting had taken place because she had heard Diana [Vilanova] still using the N word in the office" while they were on a shift together.  [*Id.*]

Kelly was "forced to interact with" Vilanova because managers put them on overlapping shifts, and "a variety of incidents continued."  [*Id.* ¶ 24.]  On April 3, 2023, Kelly called the Sheriff's Office after Vilanova picked up Kelly's "vintage designer bag and began thrashing it."  [*Id.* ¶ 25; Ex. G at ECF p.44.]  The Sheriff's Office employee told her that the incident "was to be handled by the supervisor."  [*Id.* ¶ 25.]

### 5.    More Favorable Treatment of Other Employees

Kelly alleges that coworkers' poor performance was overlooked, and that other employees were given preferential treatment for scheduling.  For instance, during her probationary period, Vilanova called in sick on 35 days and even went AWOL on her shift.  [*Id.* ¶ 18.]  Permanent employees, however, were permitted 13 calendar sick days per year, and Kelly "was not allowed to perform like this during [her] probationary period and get hired."  [*Id.* ¶¶ 18-19.]  Antoc also "reversed [Vilanova's] AWOL."  [*Id.* ¶ 18.]  In addition, Vilanova was Kelly's "reliever" for shifts, and calling in sick or canceling her shifts caused Kelly to have to cover the shifts, interrupted her departure time, caused her to miss other deadlines and obligations, and required her to "train other people from elsewhere in the hospital to stabilize/leave the office safely[.]"  [*Id.* ¶¶ 18, 26.]

Temporary staffer Edgar Tolentino also frequently called in sick or canceled his shifts, with similar ramifications for Kelly.  [*Id.* ¶ 26.]  Moreover, Tolentino arrived at his shifts late without having time deducted; came in high smelling like marijuana; took long breaks to smoke marijuana in his vehicle while parked on hospital grounds, did not complete work; slept most of each shift; gave his badge to his girlfriend, a "former temp registry" staff member so she could use the bathroom and facility; made unwanted advances to other females; and twice opened the zipper of Kelly's purse.  [*Id.* ¶ 27; *see id.* ¶ 32 (explaining that "[t]ardies are supposed to be entered by the Supervisor on duty when the employee arrives at/past 15 minutes [after] the start of the shift").]  Night shift supervisors and directors tolerated this behavior from Tolentino, even though they did not from

other employees.  [*Id.*]  Kelly reported this behavior to HR.[6]  [*Id.*]

At or around 2023, supervisor Jun Li informed Kelly that Antoc had told Li to watch Kelly's time.  [*Id.* ¶ 33.]  When Kelly clarified that Antoc meant that Li should watch everyone's time, Li said that Antoc told her to specifically watch Kelly's time.  [*Id.*]  Li agreed with Kelly that other employees arrived late and did not have their time docked or deducted.  [*Id.*]

Kelly also alleges that other employees were given preferential treatment in selecting shifts to work.  For instance, Mary Khine, who is Asian and was hired one year after Kelly, did not have to work the night shift, and was able to work the 3:00-11:30 PM shift.  [*Id.* ¶ 28.]  It was not until 2022 that Kelly finally worked the 3:00-11:30 PM shift, "years" after she was hired.  [*Id.*]  Khine was also promoted to a full-time 1429 NSA position at or around 2023.  [*Id.*]

In addition, Khine and Adia Johnson "were allowed to do special assignments such as doing Payroll for the Hospital, seemingly in exchange for more desirable working conditions and/or treatment" such as "full-time status, weekends off," and, in Khine's case "approved vacation/paid benefit time off[.]"  [*Id.* ¶ 36.]

With respect to scheduling, 1429 NSAs such as Kelly were supposed to be given an opportunity to fill overtime and holiday shifts first, before such shifts were offered to "out of classification 1428 Unit Clerks."  [*Id.* ¶ 30.]  However, 1428 Unit Clerks received opportunities to fill overtime and holiday shifts before Kelly did.  [*Id.*]  Kelly also noticed that Khine was allowed to work on Veteran's Day 2024, while Kelly was "passed over" even though she is more senior and it was her turn in the rotation.  [*Id.*]

At some point in 2024, supervisor Herbert Mariano (who is Asian) sent Kelly home on a holiday but allowed Vilanova to work and receive holiday pay.  [*Id.*]

On November 17, 2024, Kelly sent an email to Human Resources and the SEIU Union describing how a year earlier, on November 14, 2023, she found that her Saturday, November 18

---

[6] The SOF cites to Exhibits H, K, and L.  [SOF ¶ 27.]  These exhibits do not appear to relate to Tolentino.  [*See* Ex. H (emails with subject "Shana Kelly Flexible Work Schedule Form Completed"); Ex. K (document titled "Article II – Employment Conditions"); Ex. L (emails with subject "Shana Kelly Flexible Work Schedule Form Completed").]

United States District Court
Northern District of California

and Sunday, November 19 shifts had been "taken off because Birgitta [Van Ewijk] is working as Nurse Operations." [Ex. M at ECF p.68.] "Additionally, a day later on 11/17/23[,] a Holiday schedule was removed, and another staffer was put in two Holidays in a row outside of rotation." [*Id.*] Van Ewjik also "use[d] favoritism [by] having Shane Peralta selected out of the entire Hospital to work as a Staffer on a Holiday in the NSO, working out of class [and] making 3 times as much as us." [*Id.*]

Kelly's November 17, 2024 email further described how Van Ewjik "ha[d] shown [Kelly] a lot of disrespect . . . since" Kelly had reported Vilanova's use of a Spanish slur and the N-word. [Ex. M at ECF p.68.] Kelly recounted how, after she reported the knife incident, Van Ewjik "said [that Kelly's] problem is that [she is] too sensitive, essentially saying . . . that she/leadership subscribes to this." [*Id.*] Kelly also explained how "[o]n 10/22/23 [Van Ewjik] was bullying and berating [her,] telling [her] she is the supervisor when she was acting disruptively toward[s] [Kelly] regarding things that [Van Ewjik] and another staffer were working on" while Kelly "was working on another time sensitive task." [*Id.* at ECF p.69.] Kelly further stated that Van Ewjik "says things to [her] like 'do not talk'" and that she "perceive[d] [Van Ewjik's] antics towards [Kelly] to be intentional bias/racism." [*Id.*]

Kelly also reported that Van Ewjik "has expectations of [her] of final reports [that are] different than other staffers" and has "started acting irrationally and aggressively[,] accusing [Kelly's] numbers of being wrong." [*Id.*] Van Ewjik also "is selective with her reporting of other staffers versus how she reports nuances involving [Kelly]." [*Id.*]

### 6. Promotion of Other Employees Over Kelly

According to "past practice," "existing 1429 [NSAs]" would be promoted to full-time in order of seniority, and external candidates would fill the remaining open positions, such as part-time. [*Id.* ¶ 29.] Kelly alleges that she remained in a part-time position, while less senior and less qualified employees were promoted to full-time positions.

Around 2023, Khine was promoted to full-time 1429 NSA, even though Khine "did not have to pass the 100% weighted City Exam" for a 1429 NSA position. [*Id.* ¶ 28.] The job announcement

United States District Court
Northern District of California

for the position also stated "that the scores that are ranked 1-10 are eligible to be hired for the job."[7] [*Id.*]  Khine was hired over Kelly, even though (1) Kelly scored 9, which was within the eligible scores, whereas Khine ranked 14 and "never passed the reachable posted rank of 1-10 requirement, and (2) Khine had "one plus years less seniority" than Kelly.  [*Id.*]  Kelly alleges that she should have been hired instead, as she had a ranking within the acceptable range and was more senior.  [*Id.*]

Despite Tolentino's poor performance, he "was put in full-time in March 2024 ahead of [Kelly] due to a technicality of not submitting an additional interest tab after completing the exam and both [Tolentino and Kelly] ranking between 1-10."[8]  [*Id.* ¶ 28.]

Kelly also alleges that Tsue and Aisha were promoted ahead of her, even though they were hired in 2022 and 2023, respectively.  [Compl. at 5.]

In early 2024, Kelly contacted DPH HR to ask about a promotion to the full-time 1429 NSA position.  [Ex. O at ECF p.85.]  On January 20, 2024, an HR Analyst explained that the department was "following the Rule of 10 for the 1429 eligible list.  We have to move down the rank when filling our positions.  If your name appears next on the rank, you will be contacted by a manager." [*Id.*]  Kelly replied on January 22, 2024, explaining Khine's promotion the prior year and Kelly's concerns about the eligibility list.  [*Id.* at ECF p.84.]  Kelly's email reply states that Antoc "said today that a fulltime 1429 was selected from outside so I wanted to be considered before they are, and I want to be rolled over into a Fulltime 1429."  [*Id.*]

On August 28, 2024, Kelly applied for a full-time 1429 NSA position posted online, but the posting was canceled on September 20, 2024.  [SOF ¶ 37.]  Kelly asked the nursing supervisor Arnold Dignadice, who is Asian, why the job posting was canceled, and he told her that HR canceled the job because there were no applicants.  [*Id.*]  Kelly told him that she had applied, and Dignadice directed her to HR.  [*Id.*]  Kelly raised the issue with HR, and they replied on September 23, 2024 that they would "review and respond accordingly."  [Ex. O at ECF 81-83.]  Kelly was later told that the Hiring Manager decided to cancel the posting.  [SOF ¶ 40.]

---

[7] The SOF does not explain how scores are ranked.

[8] The SOF does not explain what the "interest tab" is, or what type of exam Kelly took.

### 7.    Kelly's Meetings Regarding Bias in the Workplace

Kelly "met with [DPH] EEO" on October 9, 2024, "regarding the inequities and bias" in the workplace.  [SOF ¶ 38; Ex. N at ECF pp.71-75.]  Kelly also met with Dignadice on October 10, 2024 (Ex. N at ECF pp.74-75) and again on October 21, 2024, about the full-time position and "the inequity in hiring" that Kelly alleges was adversely affecting her.  [SOF ¶ 39].  Kelly also raised with Dignadice the unequal application of late attendance policies and that Asian supervisors Ferrer and Marie Green "got upset" at Kelly when she asked questions about late time for Tolentino and Vilanova not being recorded.  [*Id.*]

On October 30, 2024, Dignadice met with Kelly and the union steward.  [*Id.* ¶ 42.]  At the meeting, Dignadice told Kelly that her "coworkers feel 'attacked and watched' by [her]."  [*Id.* ¶ 43.] Kelly responded "that the hostile work environment/workplace violence in here like the n word from Diana and ongoing inequities has not been *peaceful* for [her]."  [*Id.* (emphasis in the original).]

On November 8, 2024, Dignadice asked Kelly to meet with him to discuss tardiness; after requesting to have a union representative present, Kelly left the meeting and returned to her desk, and Dignadice emailed Kelly a memorandum for Coaching and Counseling for Unprofessional Behavior and a Written Warning about her attendance.  [*Id.* ¶ 46; Ex. P at ECF pp.87-93.]

On the same day, Kelly also received an email for a Mandatory Threat Assessment Investigation from the DPH Director of Security regarding a report of workplace violence during the October 30, 2024 meeting.  [SOF ¶ 45.]  Kelly alleges that a Threat Assessment Investigation was not used for the employees in prior incidents, including for Saez-Fontilla for the 2019 knife incident and for Vilanova for her use of the N word or "thrashing" Kelly's purse.  [*Id.*]  Kelly attaches an email from her union representative on November 13, 2024, noting that Dignadice acted in violation of Kelly's Weingarten Rights when he proceeded with the meeting without a union representative in attendance.  [SOF ¶ 47; Ex. Q at ECF pp.95-96 (also noting Dignadice's conduct was "entrapment," and that Dignadice did not follow the SEIU seniority rule for over-time assignments).]  Kelly sent a further email to DPH EEO the same day.  [SOF ¶ 48; Ex. Q at ECF pp.99-101).]

On November 12, 2024, Kelly spoke to supervisor Stephanie Chigos (who is Latina) after

9

noticing "a potential error that had both [Kelly] and [Dignadice] in the schedule getting paid for working the Veteran's Day Holiday." [SOF ¶ 49.]  On November 17, 2024, Kelly alleges her access to the staffing software OneStaff was "suddenly restricted," such that she no longer had access to view her own schedule, and that her access "was the only one that got restricted."  [*Id.*]

### B.    Procedural History

Kelly initiated this action on November 27, 2024.  The complaint asserts four claims under Title II of the Civil Rights Act of 1964: (1) race discrimination, (2) racial harassment/hostile work environment created by Kelly's supervisors, (3) racial harassment/hostile work environment created by Kelly's co-workers, and (4) retaliation.  [Compl. at 5-14.]

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief," *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009)); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

In deciding a 12(b)(6) motion, a court "may consider documents attached to the complaint." *Yates v. W. Contra Costa Unified Sch. Dist.*, No. 16-CV-01077-MEJ, 2016 WL 2739389, at *2 (N.D. Cal. May 11, 2016) (citing *Parks Sch. of Bus.*, 51 F.3d at 1484).  However, "a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."  *Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003)

United States District Court
Northern District of California

1    (quoting *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)).

2    **III.    DISCUSSION**

3        The City moves to dismiss all of Kelly's claims as well as her request for punitive damages.

4    [Mot. at 15-25.]

5        **A.    Request for Judicial Notice**

6        The City asks the court to take judicial notice of Kelly's Complaint of Discrimination filed

7    on October 7, 2023 with the California Civil Rights Department and Charge of Discrimination (Case

8    No. 202306-20949312), which was dual filed with the Equal Employment Opportunity Commission

9    (EEOC Charge No. 37A-2024-00059, dated October 9, 2023).  [Docket No. 13-2 (RJN) ¶ 1 &

10    Ex. A.]  Kelly does not oppose this request.  [*See* Opp'n.]

11        The court may take judicial notice of facts that are either (1) "generally known within the

12    trial court's territorial jurisdiction; or (2) capable of accurate and ready determination "from sources

13    whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  "'In the context of

14    employment discrimination cases in particular, it is well established that courts may consider the

15    administrative record of a plaintiff's claims before the EEOC as judicially noticeable matters of

16    public record.'"  *Gunzenhauser v. Garland*, No. 22-CV-03406-WHO, 2023 WL 2167387, at *3

17    (N.D. Cal. Feb. 21, 2023) (quoting *Lacayo v. Donahoe*, No. 14-CV-04077-JSC, 2015 WL 993448,

18    at *9 (N.D. Cal. Mar. 4, 2015).  The court thus takes judicial notice of the existence of the EEOC

19    charge, including the date of filing, but not of any disputed facts therein.  *See Yih v. Taiwan*

20    *Semiconductor Mfg. Co., Ltd.*, No. 5:20-CV-04184-EJD, 2020 WL 6290377, at *3 (N.D. Cal. Oct.

21    27, 2020), *aff'd sub nom. Yih v. Taiwan Semiconductor Mfg. Co., Ltd*, No. 20-17237, 2021 WL

22    3783096 (9th Cir. Aug. 26, 2021) (judicially noticing EEOC charge but not "disputed facts therein"

23    because "a court 'cannot take judicial notice of disputed facts contained in such public records.'")

24    (quoting *Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 774 (N.D. Cal. 2019)).

25        **B.    Failure to Exhaust Administrative Remedies**

26        The City argues that the court may not consider incidents that occurred more than 300 days

27

28

United States District Court
Northern District of California

before Kelly filed her charge with the EEOC on October 9, 2023, as such conduct is time-barred.[9] [Mot. at 16-17.]  Kelly contends that earlier incidents are timely because she received a right to sue notice on September 6, 2024, which allowed her 90 days to file the instant complaint, and because the EEOC delayed her intake process due to "exigent circumstances."  [Opp'n at 1.]

"Before asserting claims under Title II in district court, a plaintiff must first exhaust her administrative remedies by filing a complaint with the appropriate government agency and obtaining a right to sue letter.  42 U.S.C. § 2000e-5(e)(1).  "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Scott v. Gino Morena Enters., LLC*, 888 F.3d 1101, 1106 n.2 (9th Cir. 2018) ("If the charge is initially filed with a state agency that enforces the state's own anti-discrimination laws, like the DFEH in California, the statutory 180–day rule does not apply.  Instead, a Title VII charge must be filed within 300 days after the allegedly unlawful employment practice or 30 days after notice that the state agency has terminated its proceedings under state law, whichever is earlier.") (citing 42 U.S.C. § 2000e-5(e)(1)).  Title VII thus "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period" for filing a charge, "i.e., 300 days before the charge is filed." *Scott*, 888 F.3d at 1112 (quoting *Morgan*, 536 U.S. at 105).

---

[9]  The City's argument regarding the cut-off date is inconsistent.  The motion argues the cutoff date is December 12 or 13, 2022.  [Mot. at 9 ("All alleged discriminatory incidents that occurred before **December 12, 2022**, are time-barred as Plaintiff failed to timely exhaust her administrative remedies by filing a charge with the EEOC . . . ."  (emphasis added); *id.* at 15 ("All Incidents Occurring Before **December 12, 2022** are Time Barred") (emphasis added); *id.* at 17 ("Here, incidents pre-dating **December 13, 2022** are time barred . . .") (emphasis added); *id.* at 16 ("Since Plaintiff is allowed three hundred (300) days to file a charge for each discrete act, incidents that occurred on or before **December 13, 2022** (300 days before Plaintiff filed her EEOC Charge), are timed barred.") (emphasis added).]  The City's reply argues that "[a]ll discriminatory incidents alleged by Plaintiff that occurred before **December 22, 2022**, are time-barred and cannot be considered."  [Reply at 2 (emphasis added).]  In any event, the City's argument that the filing date is October 9, 2023 makes the cut-off date December 13, 2022 (October 9, 2022 – 300 days).

United States District Court
Northern District of California

Kelly filed her complaint of discrimination with the California Civil Rights Department ("CRD")[10] on October 7, 2023.  [RJN, Ex. A at ECF pp.9-10.]  Pursuant to the Worksharing Agreement Between State of California Civil Rights Department and the U.S. Equal Employment Opportunity Commission for Fiscal Year 2022 ("2022 Worksharing Agreement"), "the EEOC and the [CRD] each designate the other as its agent for the purpose of receiving . . . charges[.]"  *Id.* § II(A)[11]; *see* FY2024 Extension of Worksharing Agreement (extending the 2022 Worksharing Agreement through September 30, 2024).[12]  Thus, "a charge filed with the [CRD] is deemed to have been received by the EEOC on the same day." *Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1244 (9th Cir. 2010) (cleaned up); *see Hernandez v. Golden Gate Reg'l Ctr.*, No. 24-CV-04668-MMC, 2025 WL 1069945, at *2 (N.D. Cal. Apr. 8, 2025) ("Under a 'worksharing agreement' between California and the EEOC, a charge filed with the CRD is deemed to have been received by the EEOC on the same day it is filed with the CRD, . . . where the charges filed with the CRD include at least one claim over which the EEOC has concurrent jurisdiction[.]") (cleaned up); *see* Cal. Code Regs. tit. 2, § 10019 ("Complaints filed with the [CRD] that include at least one claim over which the EEOC has concurrent jurisdiction shall be dual-filed with the EEOC . . .").

The City asserts, without explanation, that the filing date is October 9, 2023, when "Plaintiff filed her EEOC Charge[.]"  [Mot. at 16; *see* RJN, Ex. A at ECF p.11.]  The City does not address the effect of the 2022 Worksharing Agreement, which applied at the time Kelly filed her CRD complaint.  Nor does the City otherwise explain why the court should not find that Kelly's CRD complaint was constructively filed with the EEOC on October 7, 2025.

Nothing in the record presently before the court indicates that the terms of the Worksharing

---

[10] CRD was formerly known as the Department of Fair Employment and Housing ("DFEH").  *See* Civil Rights Department, State of California, *Department Name Change*, https://calcivilrights.ca.gov/deptnamechange/.

[11] Worksharing Agreement between State of California Civil Rights Department and the U.S. Equal Employment Opportunity Commission for Fiscal Year 2022, https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2022/10/California-FY-2022-Worksharing-Agreement.pdf.

[12] FY 2024 Extension of Worksharing Agreement, https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2024/04/EEOC-Contract-FY-2024-Extension.pdf.

United States District Court
Northern District of California

1    Agreement did not apply to Kelly's CRD complaint.  *Cf. Hernandez*, 2025 WL 1069945, at *2

2    ("[T]he CRD appears to have found the terms of the worksharing agreement were inapplicable to

3    Hernandez's charge, as the CRD stated in its right-to-sue notice . . . that said charge 'was not dual

4    filed' with the EEOC . . . . Consequently, Hernandez was required to have filed a charge with the

5    EEOC no later than 300 days after July 7, 2022 . . . .") (cleaned up).  Accordingly, the court finds

6    that October 7, 2023 is the relevant filing date, and that only acts that occurred 300 days before

7    October 7, 2023—that is, before December 11, 2022—are actionable. [13]  To the extent any of Kelly's

8    claims are based on events that occurred before December 11, 2022, the complaint does not allege

9    that Kelly exhausted administrative remedies as to those events.

10           Kelly argues the court may consider events occurring more than 300 days before she filed

11   her EEOC charge because the EEOC issued a right-to-sue notice on September 6, 2024, and because

12   her EEOC intake interview was postponed due to "exigent circumstances."  [Opp'n at 1 (citing *id.*,

13   Ex. R (emails rescheduling EEOC interview); *see* Ex. A (right-to-sue letter).]  The City contends

14   that even if the court considered these facts raised for the first time in her opposition, Kelly has not

15   alleged she filed any written statement with the EEOC before October 9, 2023 that could be

16   considered a charge.  [Reply at 3-4.][14]

17           Kelly's arguments are unsupported.  She does not cite any authority supporting her

18   contention that the 300-day limitation period may be extended if the EEOC intake interview is

19   postponed.  She also conflates the limitation period with the deadline to file a lawsuit.  A right-to-

20   sue notice triggers the deadline to file a lawsuit.  42 U.S.C. § 2000e-5(f)(1) ("[W]ithin ninety days

21

22   _____

     [13] In a footnote, the City acknowledges that "Plaintiff also cross-filed her charge with the California

23   Civil Rights Department . . . on October 7, 2023.  Even if the Court utilizes this earlier filing date,
     discrete incidents alleged in Plaintiff's complaint before December 11, 2022 are time barred."  [Mot.

24   at 16 n.4.]

25   [14] "The court is required to construe [litigants'] EEOC charges with utmost liberality since they are
     made by those unschooled in the technicalities of formal pleading."  *Brown v. Dep't of Pub. Safety*,

26   446 F. App'x 70, 73 (9th Cir. 2011) (citation omitted).  In *Federal Express Corp. v. Holowecki*, the
     Supreme Court approved the EEOC's "rule that a filing is deemed a charge if the document

27   reasonably can be construed to request agency action and appropriate relief on the employee's

28   behalf[.]"  552 U.S. 389, 404-05 (2008).

after the giving of such [right-to-sue] notice a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved . . . ."); *Stiefel*, 624 F.3d at 1245 (9th Cir. 2010) ("After receiving an EEOC right-to-sue letter . . . , a plaintiff generally has 90 days to file suit."). In other words, the filing date of the EEOC charge sets forth the cutoff date for actionable conduct (i.e., conduct that occurred 300 days prior to the filing of the charge), whereas the right-to-sue letter satisfies the jurisdictional requirement of exhaustion of remedies and allows a litigant to file a lawsuit within 90 days.

When determining what conduct falls within the 300-day period, "[t]he Supreme Court has distinguished between discrete employment actions, which can form the basis for a disparate treatment or retaliation claim, and repeated actions, which collectively can form the basis for a hostile work environment claim." *Lui v. DeJoy*, 129 F.4th 770, 781 (9th Cir. 2025) (citing *Morgan*, 536 U.S. at 115). The court thus considers the limitations period for Kelly's disparate treatment and retaliation claims, and her hostile work environment claim, separately.

### 1.   Racial Discrimination and Retaliation Claims

The City argues that the court may not consider the following alleged acts that predate December 11, 2022, with respect to Kelly's first and fourth claims for racial discrimination and retaliation, respectively:

- The March 23, 2019 knife incident and complaints thereafter;
- The five-day unpaid suspension proposed by Guina and Blanco;
- The failure to restore Kelly to her original work schedule when she returned from her leave of absence on November 19, 2019;
- The unequal distribution of holiday shifts;
- The unequal application of sick leave policy; and
- Vilanova's November 20, 2022 use of the N-word and "choco," and the November 30, 2022 complaint filed with Antoc and Van Ewijk.

[Mot. at 16-17.]

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the

ability to recover for it." *Morgan*, 536 U.S. at 110; *see Lui*, 129 F.4th at 781 ("For discrete acts of retaliation or discrimination, the statutory deadlines run from the date of the act.") (citing *Morgan*, 536 U.S. at 110). Because each of the aforementioned events pre-date December 11, 2022, the court finds they may not form the basis of Kelly's discrimination and retaliation claims.

### 2.    Hostile Work Environment

"Hostile environment claims are different in kind from discrete acts[,]" as "[t]heir very nature involves repeated conduct." *Morgan*, 536 U.S. at 115 (citation omitted). "The 'unlawful employment practice' therefore cannot be said to occur on any particular day." *Id.* Rather, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citations omitted). In other words, hostile work environment claims "are based on the cumulative effect of individual acts." *Id.*

"Generally, a Title VII plaintiff may not base a claim on conduct occurring outside the statutory time period for filing a charge (i.e., 300 days before the charge is filed)." *Scott*, 888 F.3d at 1112); *see Lui*, 129 F.4th at 781 ("For hostile work environment claims, 'an act contributing to the claim' must 'occur[ ] within the filing period.'") (quoting *Morgan*, 536 U.S. at 117) (brackets in the original). "However, under the continuing violations doctrine, acts that fall outside the statutory time period may be actionable." *Scott*, 888 F.3d at 1112 (citing *Morgan*, 536 U.S. at 122). Because "'[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice . . . the entire time period of the hostile environment may be considered by a court for the purposes of determining liability' so long as at least one 'act contributing to the claim occurs within the filing period.'" *Id.* (quoting *Morgan*, 536 U.S. at 117).

The court will thus consider acts that occurred prior to December 11, 2022, provided that there is conduct contributing to the hostile work environment that took place after that date.

### C.    Race Discrimination

Kelly's claim for race discrimination is based on the City's failure to promote her to a full-time 1429 NSA position, inequitable accrual of benefits, and various incidents in which she alleges that other employees received preferential treatment based on race. [Compl. at 5-6.] The City argues that Kelly does not allege sufficient facts to establish that she was treated differently from

United States District Court
Northern District of California

similarly situated employees because of her race.  [Mot. at 18-21.]

A prima facie case of racial discrimination requires to plaintiff to show that "(1) the plaintiff belongs to a protected class, (2) [s]he was performing according to his employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."  *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690–91 (9th Cir. 2017) (cleaned up).

For purposes of a Rule 12(b)(6) motion to dismiss, Kelly need only allege sufficient facts to state a claim based on the elements of her prima facie case.[15]  *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1136 (9th Cir. 2019).  "While a plaintiff need not plead facts constituting all elements of a prima facie employment discrimination case in order to survive a Rule 12(b)(6) motion to dismiss, courts nevertheless look to those elements to analyze a motion to dismiss, so as to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 796–97 (N.D. Cal. 2015).

The City does not dispute that the complaint alleges facts that meet the first and second elements of a prima facie case, but argues that Kelly fails to adequately allege that she suffered an adverse employment action on account of her race.[16]  [Mot. at 19-20.]  "For claims of disparate

---

[15] "The *McDonnell Douglas* framework does not apply at the pleading stage." *Young v. Buttigieg*, No. 19-CV-01411-JCS, 2021 WL 981305, at *6 (N.D. Cal. Mar. 16, 2021) (citing *Austin*, 925 F.3d at 1137); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798-802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) ("The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. . . . The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. . . . [the plaintiff then must] demonstrate that [defendant's] reasons . . . were mere pretext.").

[16] Indeed, Kelly pleads the first element of a prima facie case because the complaint states she is Black.  [Compl. at 5; *Reed v. City of Culver City*, No. LA CV19-10526 JAK (RAOx), 2022 WL 17254356, at *7 (C.D. Cal. Sept. 23, 2022), *aff'd*, No. 22-56099, 2023 WL 8714898 (9th Cir. Dec. 18, 2023) ("There is no dispute that Plaintiff, as an African American, is protected by Title VII . . .").]

As to the second element, Kelly alleges she received "satisfactory" performance reviews every year from 2016 through the present in the part-time NSA role.  [Compl. at 4-5.]  She also submitted an email showing that her test score in February 2023 was high enough to "place[] [her] onto a ranked

United States District Court
Northern District of California

treatment under Title VII, an adverse employment action is one that 'materially affects the compensation, terms, conditions, or privileges of employment.'" *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)). The City specifically challenges two allegedly adverse actions: the failure to promote and the inequitable accrual of benefits. [*Id.*] As discussed above, any discrete discriminatory acts that occurred to prior to December 11, 2022 are time-barred.

### 1.    Failure to Promote

The City argues there are insufficient allegations to support a reasonable inference that Kelly was denied a promotion to a full-time 1429 NSA position because of her race.[17] [Mot. at 19-20.] The court agrees.

Kelly alleges that even though she has been a part-time 1429 NSA since 2016, three other part-time NSAs (Khine, Aisha, and Tolentino) were promoted over her to full-time status in 2023 and 2024. [Compl. at 5.][18] Kelly also alleges she applied to a posting for a full-time 1429 NSA in August 2024 but the posting was taken down in September 2024. [SOF ¶ 37.]

As pleaded, these examples do not support Kelly's racial discrimination because the complaint fails to allege facts sufficient to show that Kelly and these co-workers were similarly situated. For instance, although the complaint alleges that Khine had a ranking of 14 in 2017 (SOF ¶ 28; Ex. I at ECF pp.49-50), there are no allegations about Khine's eligibility for promotion in 2023 to allow the plausible inference that Kelly and Khine were similarly situated at the relevant time.

The same is true with Aisha. The allegations regarding Aisha fail for the additional reason that , as Kelly confirmed at the hearing, Aisha is also Black and thus of the same protected class as

---

eligible list" for the full-time NSA position. [Ex. H at ECF pp.46-47.] Kelly's allegations about her satisfactory performance reviews, seniority as a part-time NSA, and her February 2023 test score support an inference at the pleading stage that she was qualified for a full-time NSA job.

[17] Although the City does not argue that Kelly was not qualified for the full-time role, the City "do[es] not concede the full time 1429 [NSA] position is a qualified promotion from [Kelly]'s current position. [Mot. at 13 n.2.]

[18] The complaint alleges that employees Tsue and Vilanova were "hired in 2022" but does not assert they were promoted over Kelly. [Compl. at 5.]

Kelly. Kelly therefore cannot rely on Aisha's promotion to support her claim of race discrimination.

With respect to Tolentino, DPH HR explained to Kelly that the promotion process is tied to eligibility rankings between 1-10 (the Rule of 10). [Ex. O at ECF 85.] Kelly acknowledges that Tolentino also had an eligibility rank in 1-10 and was promoted "ahead of [her]" in March 2024 because of "a technicality" which involved Kelly's failure to submit a "continued interest tab," presumably to express interest in full-time 1429 NSA job. [SOF ¶ 28; Ex. N at ECF p.72.] Kelly and Tolentino were thus not similarly situated when he was promoted.

Finally, Kelly's 2024 application to a full-time NSA position that was canceled by the Hiring Manager (SOF ¶¶ 37, 40) is unsupported by facts to show that the cancellation was motivated by racial animus or how similarly situated non-Black applicants (if any) were treated, so as to "give rise to an inference of discrimination." *Robinson v. Rigas*, No. 20-CV-07907-JSC, 2021 WL 3112419, at *6 (N.D. Cal. July 22, 2021).

In sum, Kelly has not sufficiently pleaded a disparate treatment claim based on a failure to promote her to a full-time NSA position because of her race.

### 2.    Inequitable Pace of Accruing Benefit Time

The City argues there are no allegations supporting that Kelly's alleged accrual of vacation, float, holiday-in-lieu, and sick time at a different rate than other employees was due to racial animus. [Mot. at 20-21; *see* Compl. at 6.]    The nature of this allegation is unclear; the court liberally interprets this to mean that other employees accrued benefit time at a fast rate because they were promoted ahead of her to full-time positions, while Kelly remained in a part-time position.

The City points to the allegations that the City improperly used 1428 Unit Clerks to fill in for 1429 NSAs, and argues there are no facts to show that this hiring practice was racially motivated. [Mot. at 20.] The court agrees. Although the complaint alleges that 1428 Unit Clerks were offered overtime shifts and promotion opportunities ahead of Kelly (SOF ¶ 30), there are no facts giving rise to a plausible inference that Kelly was denied such opportunities because she is Black. Accordingly, the inequitable pace of accruing benefit time, as alleged, is not enough to constitute an adverse employment action based on race.

### 3.    Other Alleged Adverse Employment Actions

Kelly's other alleged adverse employment actions are insufficient to support her claim of race-based discrimination because she has not sufficiently pleaded that they "materially affect[] the compensation, terms, conditions, or privileges of [her] employment." *Campbell*, 892 F.3d at 1012 (citation omitted).

Kelly alleges that part-time 1429 NSAs Khine, Adia Johnson,[19] Vilanova, and Tolentino received more desirable working conditions, lax discipline, or preferential shift assignments. [*E.g.*, SOF ¶¶ 27, 36.] First, Kelly's vague allegations regarding isolated incidents of favoritism— including the more desirable working conditions for Khine and Johnson, the lax discipline for Valentino and Tolentino, and accommodating shift preferences for Khine (*id.* ¶¶ 18, 27, 28, 36)— are insufficient to support a disparate treatment claim because there are no facts to suggest that the more favorable treatment of Khine, Johnson, Vilanova, and Tolentino was based on race. *Austin v. ABC Legal*, No. 21-CV-09076-SI, 2022 WL 847307, at *3 (N.D. Cal. Mar. 22, 2022) (finding discrimination claim "inadequately plead[ed]" where "the complaint . . . fail[ed] to identify any relevant comparator group of employees from which such an inference of favoritism could be derived"); *Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1257 (D. Or. 2008) ("Favoritism and unfair treatment, unless based on a prohibited classification, do not violate Title VII.") (quoting *Candelore v. Clark Cnty. Sanitation Dist.*, 752 F. Supp. 956, 961 (D. Nev. 1990), *aff'd*, 975 F.2d 588 (9th Cir. 1992)).

Similarly, the allegations that Kelly occasionally was treated less favorably by disregarding her more senior status when assigning shifts, denial of opportunities to work on holidays, and monitoring her time (SOF ¶¶ 30, 33, 49), as pleaded, do not rise to the level of adverse employment actions. As alleged, these examples are isolated instances that cannot support a discrimination claim. *See Moore v. C.F.Y. Dev. Inc.*, No. 25-CV-0034-DAD-CKD (PS), 2025 WL 2636311, at *2 (E.D. Cal. Sept. 12, 2025) ("Isolated instances will not usually demonstrate a violation of federal

---

[19] The allegedly favorable treatment of Adia Johnson does not support Kelly's racial discrimination claim, as Kelly confirmed at the hearing that Johnson is also Black.

United States District Court
Northern District of California

antidiscrimination laws.") (citing *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021)). Moreover, there are no allegations that support a plausible inference these actions were racially motivated.

In sum, Kelly fails to allege sufficient facts to plausibly show that the City discriminated against her because of her race. The court therefore dismisses this claim with leave to amend.

**D.    Hostile Work Environment**

Kelly alleges she was subjected to a racially hostile work environment both by her supervisors (Claim 2) and coworkers (Claim 3).[20]  [Compl. at 7-10.]  The City argues that Kelly has not identified any acts of racial harassment within the 300-day filing period, and that the continuing violations doctrine bars consideration of any harassing incidents that allegedly occurred prior to December 13, 2022.  [Mot. at 17-18.]

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).  "[T]he entire time period of the hostile environment may be considered by a court for the purposes of determining liability' so long as at least one 'act contributing to the claim occurs within the filing period.'"  *Scott*, 888 F.3d at 1112 (quoting *Morgan*, 536 U.S. at 117).

To prevail on a hostile work environment claim predicated on race, "the plaintiff must demonstrate: (1) that he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Reynaga*, 847 F.3d at 686 (cleaned up).  "The plaintiff must show that the work environment was both subjectively and objectively hostile."  *Id.* at 687 (citation omitted).

"In determining whether a work environment is sufficiently hostile, the court evaluates the

---

[20] It is unclear why Kelly split her hostile work environment claim in this manner.  The court analyzes all alleged incidents to determine whether she has pleaded a racially hostile work environment claim.  As explained in this section, racially hostile conduct by a supervisor may result in liability for the employer.  Actionable conduct by a non-supervisory employee will only result in liability if the employer was negligent in controlling the work environment.

United States District Court
Northern District of California

totality of the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (citation omitted); *see Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023) ("Workplace conduct is to be viewed cumulatively and contextually, rather than in isolation."). "[O]ne-off, isolated events" are insufficient to establish conduct that is "sufficiently severe or pervasive." *Sharp*, 69 F.4th at 978. Similarly, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discrimination." *Id.* (cleaned up). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id.* (cleaned up).

"Under Title VII, whether an employer is liable for a hostile work environment depends on whether the harassing employees were the plaintiff's supervisors or her co-workers. 'If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.'" *Feroz v. Commex Corp.*, No. 23-cv-05592-LB, 2024 WL 3643087, at *7 (N.D. Cal. July 31, 2024) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). However, an employer can be held vicariously liable for a hostile work environment through conduct of an employee's supervisors. *See Reynaga*, 847 F.3d at 689 (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th Cir. 2004)). An employee is a "supervisor" for the purposes of vicarious liability under Title VII if the employee is able to take tangible employment actions against the victim. *See Vance*, 570 U.S. at 424.

Finally, as noted above, the court may consider pre-December 11, 2022 conduct under the continuing violations doctrine. *Scott*, 888 F.3d at 1112. This means that, because Kelly alleges Vilanova was overheard saying the "N word" around the office in January 2023 (*i.e.*, during the 300-day period) which contributed to the hostile work environment, the court may consider alleged incidents of harassment that took place prior to December 11, 2022. *Morgan*, 536 U.S. at 118 ("In order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment.").

United States District Court
Northern District of California

With respect to racially harassing behavior by supervisory employees, Kelly alleges that the following supervisors engaged in racially hostile conduct against her: Dignadice (Asian), Antoc (Asian), Guina (Asian), Blanco (Asian), Van Ewijk (South American), Mariano (Asian), Ferrer (Asian), Marie Green (Asian), Chigos (Latin), Dentoni (Caucasian), and "H.R. (Human Resources) officials." [Compl. at 7-8.]  Kelly also alleges that management "did not reprimand the non-Black individuals" in various incidents; that "[m]anagement exhibits a Cultural Dominance (functionalism) in the workplace; that "[e]quity is only inclusive of non-black (mostly Asian) workplace; and that "Tagalog is spoken 24 hours/day" and is not inclusive. [*Id.* at 9.]

Many of Kelly's allegations are vague and conclusory.  Liberally construing the complaint, and including incidents prior to December 11, 2022, Kelly has not alleged facts sufficient to show that she was subjected to unwelcome verbal or physical conduct by her supervisors because of her race that was severe or pervasive such that it altered the conditions of her employment and created an abusive work environment.  At most, Kelly alleges in her November 17, 2023 email to HR that Van Ewijk removed several of Kelly's weekend shifts in October 2023 and showed Kelly "lots of disrespect" after Kelly reported the "choco" and N-word incidents with Vilanova. [Ex. M at ECF p.68.] Kelly alleges that on October 22, 2023, Van Ewijk was "bullying and berating [her]," "acting irrationally and aggressively," and "trying to insult [Kelly]." [*Id.* at ECF p.69.]  Kelly further alleges Van Ewijk "says things to [Kelly] like 'do not talk'" in a way that seemed to Kelly to be "intentional bias/ racism." [*Id.*]  Kelly alleges that after October 22, 2023, Van Ewijk held Kelly to a different performance standard, for example by being "selective with her reporting of other staffers versus how she reports nuances involving [Kelly]." [*Id.*]  Then, almost one year later on September 11, 2024, Kelly wrote to Van Ewijk and others that Kelly learned Van Ewijk would "report" her for conduct at work, which made her feel "threatened." [*Id.* at ECF p.67.]

Thus, Kelly's allegations amount to five vaguely described incidents with Van Ewijk over the course of nearly two years.  As alleged, these incidents involving Van Ewijk are not so severe or commonplace to rise to the level of "pervasive frequency" that creates an "abusive working environment." *See Perez v. Hunter*, No. 23-cv-06713-JST, 2025 WL 870356, at *6 (N.D. Cal. Mar. 20, 2025) (citation omitted); *see also id.* (concluding that, absent other allegations, "facially neutral

1   [comments] related to [plaintiff's] professional performance" were insufficient to state a hostile

2   work environment claim).  Moreover, while the few specific alleged comments attributed to Van

3   Ewijk may be construed as disrespectful, the complaint lacks facts to support the allegation that they

4   were racially motivated.  Without such facts, the allegation of harassment is conclusory and is

5   insufficient to withstand the City's motion.

6       Kelly does not allege that any of her other supervisors subjected her to unwelcome verbal or

7   physical conduct that was severe or pervasive, let alone based on her race.  To the extent certain of

8   her supervisors (such as Antoc, Mariano, or Dignadice) allegedly exhibited favoritism and

9   preferential treatment to Kelly's co-workers Vilanova, Tolentino, and Khine, as discussed above,

10  the allegations do not support that this conduct occurred because of Kelly's race.  As such, they do

11  not support her claim for hostile work environment.

12      Lastly, Kelly's general allegations about management's "Cultural Dominance

13  (functionalism) in the workplace" where "equity is only inclusive of non-Black (mostly Asian)

14  workplace," and where Tagalog was frequently spoken (Compl. at 9) are unsupported by facts

15  explaining why this was "sufficiently severe or pervasive to alter the conditions of [Kelly's]

16  employment and create an abusive work environment."  *Reynaga*, 847 F.3d at 686; *see also*

17  *Rounds v. Bd. of Trs. of California State Univ.*, No. 20-CV-00170-DAD-CKD, 2024 WL 4333170,

18  at *20 (E.D. Cal. Sept. 27, 2024) (finding, on summary judgment, that "there is no evidence before

19  the court . . . to show that these incidents of coworkers speaking in Spanish while in plaintiff's

20  presence constituted harassment of plaintiff on the basis of her race"); *Jackson v. Fed. Express*

21  *Corp.*, No. 21-CV-01570-JWH-KKX, 2022 WL 22910555, at *2 (C.D. Cal. Jan. 19, 2022)

22  (dismissing hostile work environment claim brought under the Fair Employment and Housing Act

23  because allegation that plaintiff's manager "[spoke] 'negatively' about [plaintiff] in Spanish d[id]

24  not constitute verbal harassment, which typically includes 'epithets, derogatory comments or slurs'

25  based upon race.") (citation omitted).[21]  These allegations are therefore too vague and conclusory to

26

27  _____

28  [21] "Because 'Title VII and FEHA operate under the same guiding principles,' courts often analyze
    Title VII and FEHA hostile work environment claims together."  *ANA Maria Soares v. California*,
    No. 16-00128 WBS EFB, 2016 WL 3519411, at *2 (E.D. Cal. June 28, 2016) (quoting *Brooks v.*

1    support a hostile work environment claim.

2    With respect to racially harassing conduct by co-workers, Kelly alleges that Vilanova

3    referred to Kelly using the N-word and "choco" on November 29, 2022, that Ferrer heard Vilanova

4    say the N-word on another shift in early 2023, that Vilanova thrashed Kelly's purse in April 2023,

5    and that Tolentino said the N-word and twice opened Kelly's purse on unspecified dates. [Compl.

6    at 8; SOF ¶ 43.] In a January 9, 2024 email to HR, Kelly also describes Vilanova's "negativity" and

7    how Vilanova became "visibly upset" about a staffing issue, but Kelly does not allege any other

8    conduct by Vilanova directed at Kelly because of Kelly's race. [Ex. G at ECF p.43.] With respect

9    to use of the N-word in the workplace, the allegations are confined to co-worker Vilanova's conduct

10   on November 29, 2022 and a single shift in early 2023. Taken together, these are isolated incidents

11   that are not sufficiently severe or pervasive to support a claim for hostile work environment. *See*

12   *Brooks*, 229 F.3d at 924 ("[A]n isolated incident of harassment by a co-worker will rarely (if ever)

13   give rise to a reasonable fear that [such] harassment has become a permanent feature of the

14   employment relationship."); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that "mere

15   utterance of an epithet which engenders offensive feelings in an employee does not sufficiently

16   affect the conditions of employment to implicate Title VII.") (cleaned up). While Kelly may

17   subjectively perceive the environment as hostile, she has not alleged facts showing that her

18   coworkers engaged in severe or pervasive conduct that made her environment "objectively hostile."

19   *Leiland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1101 (N.D. Cal. 2008).[22]

20   Finally, even if Kelly had alleged facts demonstrating that she experienced actionable racial

21   harassment by her coworkers (which she has not), the claim would still fail because there are no

22   facts indicating the City was "negligent in controlling [her] working conditions." *Vance*, 570 U.S.

23   at 424; *see also Fried*, 18 F.4th at 650 (noting that, for coworker harassment, "an employer's prompt

24   corrective response can insulate an employer from liability") (citation omitted); *Smith v. Cnty. of*

---

26   *City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)).

27   [22] Even if the court were to reach back to consider the 2019 knife incident under the continuing
     violations doctrine, Kelly has not alleged any facts to establish that this incident was related to

28   Kelly's race or that it was more than an isolated incident.

United States District Court
Northern District of California

*Humboldt*, 240 F. Supp. 2d 1109, 1119 (N.D. Cal. 2003) ("In coworker harassment cases, some courts have held that the plaintiff must plead and prove that the employer's failure to respond adequately to harassment as part of her prima facie case.") (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001)).

Accordingly, the court grants the City's motion to dismiss Kelly's second and third hostile work environment claims.

### E.    Retaliation

The City argues that the retaliation claim fails for three reasons. First, "the Complaint does not attribute any retaliatory or discriminatory motive or animus against Plaintiff or African-Americans generally to Maria Antoc, Brigitta Van Ewijk, Arnold Dignadic[e] and/or Melanie Ferer" or "facts demonstrating that Maria Antoc, Brigitta Van Ewijk, Arnold Dignadic[e] or Melanie Ferrer were responsible for any adverse employment action." [Mot. at 24.] Second, Kelly fails to identify who made the decision not to promote her to a full time 1429 NSA position in 2023 and 2024, and does not allege facts showing that the decision maker was aware of her complaints of discrimination. [*Id.*] Third, there are no allegations showing that Kelly informed the EEOC and/or Dignadice that the inequities and biases she faced were due to her race, nor are there allegations that she suffered an adverse employment action as a result of the October 21, 2024 meeting. [*Id.*]

To state a *prima facie* claim for retaliation, Kelly must show that "she engaged in protected activity, that she suffered a materially adverse action, and that there was a causal relationship between the two." *Westerndorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) (citations omitted).

For the reasons stated above, the court only considers those events that occurred on December 11, 2022 or later.

#### 1.    Protected Activity

"An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Id.* (citations omitted). A plaintiff must "alert[] her employer to her belief that discrimination, not merely unfair personnel treatment, had occurred." *Kovalenko v. Kirkland & Ellis LLP*, No. 22-CV-05990-HSG,

2024 WL 4150451, at *7 (N.D. Cal. Sept. 10, 2024) (cleaned up). "However, an employee is not required to use legal terms or buzzwords when opposing discrimination. The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination." *Id.* (finding that plaintiff sufficiently alleged retaliation based on her gender where she alerted a supervisor to "unfair treatment" and "raised concerns regarding being asked to take on work for male associates"). "[A] complaint about an incident does not qualify as a protected activity unless a reasonable person would believe that the incident violated Title VII." *Lau v. Mayorkas*, No. 21-CV-4756-YGR, 2022 WL 22885366, at *2 (N.D. Cal. Apr. 27, 2022) (citing *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009)).

Kelly's retaliation allegations are difficult to understand. Although she appears to have raised concerns to various people, it is not at all clear that she complained about employment practices she believed violated Title VII. For the most part, her allegations suggest that she complained about incidents or aspects of the workplace that she believed were inequitable but were not necessarily connected to race—for example, the use of 1428 Unit Clerks to take shifts otherwise assigned to 1429 NSAs.

The only allegations that can be construed as stating a retaliation claim involve complaints Kelly made to EEO[23] and to her supervisor, Arnold Dignadice. Kelly "met with EEO regarding the inequities and bias" on October 9, 2024. [SOF ¶ 38.] The City contends that the complaint "does not allege if [Kelly] informed EEOC and/or Dignadic[e] that the inequities and biases she complained about were based on her protected status, i.e. her race." [Mot. at 24.] Kelly's October 17, 2024 follow up email states otherwise. [Ex. N at ECF p.73 ("All decisions made here ARE NOT BASED ON MERIT. It's by RACE.") (capitalization in the original).][24] This is sufficient to show that her October 9, 2024 meeting constitutes protected activity.

---

[23] Although the SOF does not specify whether the "EEO" refers to the EEO of LHH or the U.S. EEOC (*see* SOF ¶ 38), the exhibits attached to the complaint suggest that it is the EEO of LHH. [*See, e.g.*, Ex. Q (email from Kelly to "eeointake@sfdph.org.").]

[24] However, Kelly does not allege whether any of her supervisors were aware of her complaints to EEO, making it unclear whether this protected activity could have resulted in any materially adverse action.

United States District Court
Northern District of California

Similarly, the complaint alleges that Kelly engaged in protected activity when she met with Dignadice on October 30, 2024. [*See* SOF ¶ 43.] Kelly informed Dignadice that "the hostile work environment/workplace violence in here like the n word from Diana and ongoing inequities has not been *peaceful* for me." [*Id.* (emphasis in the original).] This allegation is sufficient to demonstrate that Kelly informed Dignadice of ongoing Title VII violations—specifically, a hostile work environment—at the October 20, 2024 meeting.

The court therefore finds the complaint sufficiently pleads the first element of a retaliation claim.

### 2.    Adverse Employment Action

The definition of an adverse employment action for retaliation claims is broader than for discrimination claims, and a plaintiff need only show that the alleged retaliatory act "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up). For retaliation, the adverse employment action also need not be severe. *See McAlindin v. Cnty. of San Diego*, 192 F.3d 1226, 1239 (9th Cir. 1999), *opinion amended on denial of reh'g*, 201 F.3d 1211 (9th Cir. 2000); *Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991) (to state a retaliation claim, the plaintiff "need not show that she was fired, demoted or suffered some financial loss as a result" of the employer's action).

The complaint alleges that on November 8, 2024, Kelly received an email notice from the Director of Security that he would be conducting a "threat assessment investigation regarding a report of workplace violence during a meeting on 10/30/24." [SOF ¶ 45.] That same day, Dignadice sent Kelly an email stating that "[y]ou are being coached and counseled to bring your attention [to] the seriousness of your conduct." [*Id*; Ex. P at ECF p.87.]. Dignadice also gave Kelly a written warning for "continued issues regarding your attendance," including chronic tardiness, and "your customer service skills." [Ex. P at ECF p.91.]

Kelly further alleges that on November 17, 2024, her "computer access to OneStaff was suddenly restricted after speaking [to a nurse supervisor] after noticing a potential error that had both [the nurse supervisor] and [Dignadice] in the schedule getting paid for working" on Veteran's

Day and receiving holiday pay, instead of just one supervisor.  [SOF ¶ 49.]  Kelly learned that she was only employee whose access was restricted.  [*Id.*]  Kelly also noticed that Khine was allowed to work the Veteran's Day holiday, even though it was Kelly's turn to do so.  [*Id.*]

As it is plausible that these acts may have dissuaded a reasonable person from making a report of discrimination, the court finds these allegations are sufficient to show that Kelly experienced adverse employment actions.

### 3. Causation

To show causation, Kelly "must establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  "Because it is often difficult for plaintiffs to adduce direct evidence of retaliation, causation between protected activity and adverse employment action may be 'inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'"  *Pringle v. Wheeler*, 478 F. Supp. 3d 899, 916 (N.D. Cal. 2020) (quoting *Hoko v. Transit Am. Servs.*, No. 14-CV-01327-LHK, 2014 WL 3963033, at *8 (N.D. Cal. Aug. 13, 2014)).

The alleged adverse actions by Dignadice occurred on November 8 and 17, 2024, just weeks after Kelly's October 30, 2024 meeting with Dignadice and the union representative.  This is close enough in time to plead causation.  *See, e.g.*, *Lau*, 2022 WL 22885366, at *10 (denial of plaintiff's promotion six weeks after filing his EEOC complaint was sufficiently close in time to plead causation for retaliation) (citing *Aki v. Univ. of California Lawrence Berkeley Nat'l Lab'y*, 74 F. Supp. 3d 1163, 1182 (N.D. Cal. 2014)).

The City's motion to dismiss the retaliation claim is denied.  If Kelly intended to state other instances of retaliation, she is granted leave to amend to attempt to do so.[25]

---

[25] In her opposition brief, Kelly describes being subjected to the mandatory "Threat Assessment" on December 10, 2024, after being notified about it on November 8, 2024.  [Opp'n at 5.]  Kelly asserts she was then placed on paid administrative leave on December 11, 2024, and temporarily reassigned to another DPH office with a new schedule and job duties.  [*Id.* at 5-6.]  Kelly argues that "these action" (unspecified) were "all done after the fact/ me filing my complaint and voicing

United States District Court
Northern District of California

**F.    Punitive Damages**

Kelly also seeks punitive damages.  [Compl. at 14.]  The City argues that her prayer for punitive damages fails as a matter of law because the City cannot be liable for punitive or exemplary damages under California Government Code section 818.  [Mot. at 25.]  Kelly does not respond on this point.  [*See* Opp'n; *Lansdown v. Bayview Loan Servicing, LLC*, No. 22-CV-00763-TSH, 2023 WL 2934932, at *4 (N.D. Cal. Apr. 12, 2023) ("[A] failure to respond in an opposition to an argument constitutes waiver or abandonment[.]") (citation omitted).]

The City is correct.  *See* Cal. Gov't Code § 818 ("[A] public entity is not liable for . . . damages imposed primarily for the sake of example and by way of punishing the defendant"); *Minkley v. Eureka City Sch.*, No. 17-CV-3241-PJH, 2017 WL 4355049, at *9 (N.D. Cal. Sept. 29, 2017) (dismissing claims for punitive damages against public entity defendants because "[s]ection 818 specifically and unambiguously prohibits awarding punitive damages against a public entity").  Kelly's request for punitive damages is dismissed with prejudice.

**G.    Leave to Amend**

Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading.  Fed. R. Civ. P. 15(a)(1).  After that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be given "freely . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is to be applied with extreme liberality."  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted).  However, leave to amend may be denied where the complaint "could not be saved by any amendment," i.e., "where the amendment would be futile."  *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).

As nothing in the record suggests that Kelly cannot allege additional facts in support of her claims, the court grants Kelly leave to amend her complaint, consistent with this order.  The amended complaint must be complete in itself; it cannot refer to prior filings.  Civ. L.R. 10-1 ("Any

my concerns of inequities in retaliation."  However, these facts are not alleged in the complaint, and the court cannot consider allegations raised for the first time in an opposition brief.  *See Broam*, 320 F.3d at 1026 n.2.

United States District Court
Northern District of California

party filing . . . an amended pleading must reproduce the entire proposed pleading and may not incorporate any part of a prior pleading by reference.").

## IV.    CONCLUSION

For the foregoing reasons, the City's motion to dismiss is granted as to Kelly's claims for race discrimination and hostile work environment.  The motion is denied as to Kelly's claim for retaliation.  The motion is granted with prejudice as to Kelly's claim for punitive damages. Kelly may file an amended complaint no later than October 30, 2025 solely to address the deficiencies identified in this order.

In addition, the court will conduct an initial case management conference on November 19, 2025 at 1:30 p.m.  This proceeding will be held via Zoom webinar.  The parties, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/dmr.  The parties may visit https://www.cand.uscourts.gov/zoom/ for Zoom guidance and set up.

The court refers Kelly to the link entitled "Representing Yourself" on the Court's website, located at https://cand.uscourts.gov/pro-se-litigants/, as well as the Court's Legal Help Centers for unrepresented parties, who may schedule an appointment by calling 415-782-8982 or emailing FedPro@sfbar.org.

**IT IS SO ORDERED.**

Dated: September 30, 2025

_____
Donna M. Ryu
Chief Magistrate Judge

United States District Court
Northern District of California

31